712 So.2d 608 (1998)
Kermit CHAMBERS, Plaintiff-Appellant,
v.
LA PAC MANUFACTURING, INC., Defendant-Appellee.
No. 97-1188.
Court of Appeal of Louisiana, Third Circuit.
April 22, 1998.
*609 Donald Lynn Mayeux, Eunice, for Kermit Chambers.
Jeffrey John Warrens, Baton Rouge, for LA PAC Mfg., Inc.
Before WOODARD, DECUIR and PETERS, JJ.
WOODARD, Judge.
The plaintiff, Kermit Chambers (Chambers), appeals the Office of Workers' Compensation's denial of his claim for workers' compensation benefits, payment of medical bills, penalties and attorney's fees, in connection with a suit he brought against his employer LA PAC Manufacturing, Inc. (LA PAC, Inc.) and its workers' compensation insurer, the Louisiana Workers' Compensation Corporation (LWCC). We affirm.

FACTS
On February 2, 1995, Chambers slipped on a greasy cat walk during the course and scope of his employment with LA PAC, Inc. as a laborer. He sustained injuries to his back and left wrist as he was carrying a sixty-five pound crate. Chambers received medical treatment at the American Legion Hospital emergency room in Crowley, Louisiana and received follow-up care from Dr. Lawrence Gardiner (Dr. Gardiner), his family physician, who then referred him to Dr. John Budden (Dr. Budden), an orthopedist. Prior to the incident, Chambers' average weekly wage was $209.64. After the accident, he received $139.76 in weekly compensation indemnity benefits from February 3, 1995, until August 17, 1995.
*610 On May 18, 1995, Chambers was arrested after having a physical altercation with his alleged wife, Alexia Williams (Williams). The Crowley City Police Department took him into custody. At the Crowley jail, Chambers placed all or part of a disposable razor into his mouth and swallowed one or more of its pieces. He was then taken to American Legion Hospital where Debra Tassin-Matte, R.N. (Nurse Tassin-Matte) and Dr. Mark Petitjean (Dr. Petitjean) evaluated him. Dr. Petitjean also referred Chambers to a mental health clinic based on his suicidal ideations.
On May 19, 1995, after Chambers' release from American Legion Hospital, he again visited Dr. Budden. His mother then made several attempts to have her son evaluated by a mental health institution. Her efforts were finally successful on May 31, 1995, when the sheriff's department transported Chambers to the Crowley Mental Health Center pursuant to an order of protective custody. While there, Charlotte Hargroder (Hargroder), a social worker, and Dr. Holden evaluated him, but Chambers was released since it was determined that he did not meet the requirements for an involuntary emergency admission.
On June 8, 1995, Chambers sustained a laceration to his wrist. He alleges that he was awakened due to leg pain, and as he was walking through one of the rooms in his house, his leg gave out, causing him to fall on a glass table and lacerate his wrist. Dr. Thomas Curtis (Dr. Curtis) treated him at the American Legion Hospital emergency room. On June 12, 1995, he saw Dr. Budden again and was referred to Dr. Louis Mes, a plastic surgeon, who gave him a brace to wear on his wrist.
On July 4, 1995, Chambers admitted himself to the Pauline Faulk Centre for Behavioral Health. He was discharged by American Legion Hospital either on July 5 or July 6, 1995 with a discharge diagnosis of depression with psychotic features and alcohol dependency.
On July 6, 1995, Chambers was incarcerated for a parole violation and spent almost three months in the Jefferson Davis Parish jail. During that time, he sought treatment once at the Moss Regional Medical Center. He spent September of 1995 to October of 1996 at the Calcasieu Parish Jail where he received pain medication for his back and arm and received visits from a physician. He spent the remainder of his time at the Avoyelles Parish Correctional Center where he was to remain in custody until about May 31, 1997.
Chambers filed suit against LA PAC, Inc and its workers' compensation insurer, the LWCC on August 5, 1996 for additional workers' compensation weekly indemnity benefits and medical expenses. The matter came up for trial on May 12, 1997. By judgment dated May 21, 1997, the workers' compensation judge ruled: that LWCC was not arbitrary and capricious in terminating his benefits on August 17, 1995, that Chambers failed to prove that the wrist injury was related to the previous back injury, that Chambers failed to establish a continued disability, that Williams was not a dependent entitled to benefits pursuant to La.R.S. 23:1201.4, and that the false statements made by Chambers were not made for the specific purpose of obtaining benefits. It is from those findings that Chambers devolutively appeals, and LA PAC Inc. answers.

ASSIGNMENTS OF ERROR
Chambers alleges that the Office of Workers' Compensation Court committed manifest error by finding that:
1. The claimant failed to prove by clear and convincing evidence that he remained temporarily, totally, disabled for any period of time after August 17, 1995 as a result of injuries sustained in the accident on February 2, 1995.
2. The claimant failed to prove that the wrist injury he sustained on June 8, 1995 resulted from or was caused by injuries sustained on February 2, 1995.
3. The claimant presented insufficient evidence to prove that he was married and had dependents who would have been entitled to his workers' compensation benefits while he was incarcerated.

*611 4. The defendants were not arbitrary and capricious in terminating benefits and therefore not awarding penalties and attorney fees.
5. That claimant was not entitled to temporary, total benefits or supplemental earning benefits in addition to those already paid.
LA PAC, Inc. and LWCC assert in their answer to the appeal that the workers' compensation judge was manifestly erroneous in failing to find that Chambers forfeited all right to benefits, if any, pursuant to violation of La.R.S. 23:1208.

LAW

TEMPORARY TOTAL DISABILITY BEYOND AUGUST 17, 1995
Chambers alleges that he suffers from continuing back pain. However, the workers' compensation judge found that "[c]laimant failed to prove by clear and convincing evidence, that he remained temporarily totally disabled for any period of time subsequent to August 17, 1995, as a result of injuries sustained in the accident occurring on February 2, 1995[.]" In reviewing workers' compensation cases, we apply the manifest error standard of review. See Huntsberry v. Martin Mills, Inc., 97-641 (La.App. 3 Cir.12/10/97); 704 So.2d 356. Manifest error exists when there is no reasonable basis for the findings, and the findings are clearly wrong based on a review of the record in its entirety. Rosell v. ESCO, 549 So.2d 840 (La.1989).
The burden of proof required of a claimant to recover temporary total disability benefits is set forth in La.R.S. 23:1221(1)(c), which provides in pertinent part:
whenever the employee is not engaged in any employment or self-employment as described in Subparagraph (1)(b) of this Paragraph, compensation for temporary total disability shall be awarded only if the employee proves by clear and convincing evidence, unaided by any presumption of disability, that the employee is physically unable to engage in any employment or self-employment, regardless of the nature or character of the employment or self-employment, including but not limited to any and all odd-lot employment, sheltered employment, or employment while working in any pain, notwithstanding the location or availability of any such employment or self-employment.
(Emphasis added.) Further, "[t]he workers' compensation judge's assessments of the credibility of witnesses or the weight of the medical evidence are not to be disturbed unless clearly wrong." Huntsberry, 704 So.2d at 357 (citation omitted).
Based on the above principles and our review of the evidence in this case, we find that the record furnishes a reasonable basis for the workers' compensation judge's finding that Chambers was not eligible for temporary total disability benefits. For example, the April 28, 1995 report from Crowley Physical Therapy to Dr. Budden noted that Chambers "appears to have made a full recovery from the LEFT WRIST INJURY." Correspondence from Dr. Budden further establishes that Chambers did not remain temporarily and totally disabled. In Dr. Budden's May 1, 1995 letter to the LWCC, he wrote that "patient indicates the left wrist has made a complete recovery. I again examined Mr. Chambers. Neurologically, he remains perfectly intact." In Dr. Budden's May 5, 1995 letter to the LWCC, he wrote that "[i]t should be noted that he has no neurological deficits, and pain is the main reason for surgery at this time." In his May 18, 1995 letter to Dr. Gardiner, he indicated that the lumbar myelogram performed on Chambers "appeared to be normal" and the post-myelogram lumbar CT scan "did reveal a small disc bulge at L5-S1, but I do not believe that this is responsible for the patient's symptoms after reviewing the scan." He also stated:
I explained to Mr. Chambers that at this time I don't feel that his symptoms are due to a lumbar disc herniation.... I checked him again neurologically, and he is perfectly neurologically intact....
I would like to make every attempt to return Mr. Chambers to work as soon as possible.... At that conclusion of that lumbar conditioning program in two weeks, and after his next office visit, then I *612 anticipate releasing him back to his regular work duties on a trial basis.
Finally, in Dr. Budden's July 12, 1995 letter to Dr. Gardiner, he opined that "[a]s far as Mr. Chambers' back is concerned, I see no reason why he should not be able to return to his previous work duties. However, he is currently unable to work due to his most recent injury to his left hand.... I personally don't feel there is any further need for treatment of the patient's back problems, and therefore I am discharging him from my care."
Not only did Chambers fail to provide objective medical evidence of a disabling injury, but he also admitted to not being restricted from all types of activity. At trial, Chambers testified that he did not do any work while he was at the Calcasieu Parish Jail from September of 1995 to October of 1996; however, he also admitted that the doctor did not take him off of work. He also testified that while at the Avoyelles Correctional Center from October of 1996 to the time of the May 1997 trial, he did do some light-duty indoor work in a dormitory setting, doing such things as dusting and cleaning. Additionally, the most current of the Avoyelles Correctional Center Current Duty Status/Recreation Status reports admitted into evidence, dated March 19, 1997, clearly did not prescribe a total restriction on Chambers' activities. Rather than circle "NO DUTY/BED REST[,]" the doctor signing the form circled "LDI"meaning "light duty indoor" and wrote that Chambers' only restriction was to not use his left hand for two months. Thus, Chambers did not meet La. R.S. 23:1221(1)'s requirement that he be "physically unable to engage in any employment... regardless of the nature or character of the employment...." (Emphasis added.) Based on these admissions, Chambers is precluded from obtaining temporary total disability benefits.
Consequently, there is no manifest error in the workers' compensation judge's conclusion that Chambers did not remain temporarily and totally disabled after August 17, 1995. Thus, Chambers' workers' compensation benefits were properly terminated. This first assignment of error is without merit.

CAUSAL RELATIONSHIP BETWEEN JUNE 8, 1995 WRIST INCIDENT AND FEBRUARY 2, 1995 WORK-RELATED INJURY
Chambers testified that on June 8, 1995, he got up from his bed to go get his back pain medicine, but his leg just gave out, causing him to fall on his coffee table and lacerate his wrist. The workers' compensation judge concluded that Chambers failed to prove causation between the June 1995 wrist injury and the February 1995 work-related back injury by a preponderance of the evidence. "Great weight is given the workers' compensation judge's factual conclusions, reasonable evaluations of credibility, and reasonable inferences of fact." City of Jennings v. Dequeant, 96-943 (La.App. 3 Cir. 11/5/97); 704 So.2d 264, 267 (citation omitted).
We find that Chambers' wrist injury was not sustained in the manner he described based on his inconsistent testimony to medical personnel. We also find that it was reasonable for the workers' compensation judge to infer that Chambers had an apparent propensity to harm himself.
June 8, 1995 Wrist Incident
Chambers gave medical personnel two other accounts of the incident that took place on June 8, 1995. First, the American Legion Hospital emergency room nurse noted the following in her June 8, 1995 report: "laceration to [left] distal forearm. States cut on drinking glass." Dr. Curtis, a board-certified family physician, noted in his medical records at American Legion Hospital that Chambers "[f]ell on drinking glass, breaking it and lacerating [left] distal volar forearm." Further, when Dr. Curtis was asked at his deposition if Chambers "had a drinking glass in his hand, and he fell, and the glass broke, resulting in the cut to the wrist[,]" he responded, "That's what I understood." Interestingly, when Dr. Curtis was asked at his deposition to describe where Chambers' laceration was, he stated, "It was acrossthe distal volar forearm is the portion of the wrist that you think about people cutting their wrist with an object. That's the best way to describe it verbally." Second, the American Legion Hospital nurse's progress notes dated July 4, 1995 recorded that "[patient] has left arm in a bracestates his wife `cut' him app. one month ago[patient] has laceration on left wrist."
*613 Interestingly, Chambers claimed that he was attempting to retrieve medication before he fell, but according to Dr. Holden's May 31, 1995 notation, Chambers was no longer taking any pain medication.
Furthermore, Dr. Curtis, the emergency room physician who treated Chambers that day, stated the following in a August 16, 1995 letter to Alicia Barousse (Barousse), the medical management nurse assigned by LWCC to coordinate Chambers' medical care: "I have memory of the patient's visit and I do not recall any reference he made to any cause of his fall, particularly any weakness in his leg as you questioned .... the possibility of [the patient's injury] being self inflicted cannot be ruled out."
Other Circumstances
Based on the violent history between Chambers and Williams and Chambers' past attempts at self-inflicted harm, the workers' compensation judge was not clearly erroneous in believing that Chambers' June 1995 injury may not have been accidental.
First, the May 1995 razor blade incident suggests that Chambers sought to harm himself at one time. His defense was that he stuck the razor blade in his mouth and was playing with it, as he would do with a straw, and that he swallowed it only because an officer bumped against him. According to the American Legion Hospital nurses' notes dated March 18, 1995, Chambers also gave an account that "he put the razor blades in his mouth and he tripped and swallowed the blades." (Emphasis added.)
However, there is ample evidence to the contrary. Patrolman Richard Baudoin gave the following account in his supplemental investigation report of May 18, 1995: "When I looked at Mr. Chambers and stated `where is the razor blade?', he stated he was going to slit his wrist." Dr. Petitjean noted in the patient history section of his May 18, 1995 summary report that "[w]hen questioned on as far as why he did this he told several medical staff members that he was trying to commit suicide." Nurse Tassin-Matte, the American Legion Hospital head nurse who also examined Chambers that day, wrote in her May 18, 1995 notes that "[p]atient stated he did not want to livestated he also drinks hard liquor in large amount almost every daysaid he had not eaten for 2 weeks just been drinkingSheriff deputy stated the patient also mentioned to them he wanted to die to go meet his father and child." She also wrote in her nursing assessment under the heading of "psychosocial needs" that Chambers was "very suicidal wants to die." Sollberger, a board-certified social worker who spoke to Chambers by telephone on May 22, 1995, wrote in her notes that "he was drinking a lot and swallowed the razor blades because of a fight with his girlfriend."
Second, Chambers displayed other homicidal and suicidal tendencies before the June 1995 wrist laceration. Hargroder, a social worker, testified at her deposition that she first came into contact with him when his mother called on November 28, 1994 to report that her son was talking about killing himself. Hargroder then received two additional calls from Chambers' mother. A second call was made on May 19, 1995, after the razor blade incident, and a third call was made on May 30, 1995, after Chambers pulled a knife on his brother, who saw him on the street and offered to give him a ride. According to Sollberger's deposition testimony, Chambers' mother called on May 22, 1995 expressing concern for her son. She told Sollberger "that he had gone to bed with a gun, that he was getting in a lot of fights, and that he had been beat up several times." Finally, an order for protective custody was issued on May 31, 1995 to bring him to mental health officials for evaluation.
Further, the medical and psychological reports entered into evidence contain entries of possible additional threats made by Chambers to himself or others since the June 1995 incident. Sollberger also testified at her deposition that Chambers called her on June 22, 1995 to tell her that he was going to hurt himself or somebody else. The American Legion Hospital nurses' notes of July 4, 1995 reveal that Chambers "had called 911 stating if he was not removed from his home he would harm his wife, himself or anyone he put his hands on because his wife was running around on him [and] he needed help now." After examining Chambers on July 4, 1995, Dr. Neal Duhon of the American Legion Hospital indicated in the history section of the physician emergency certificate he *614 signed that Chambers had "[t]rouble [with] Wife and Threatening Suicidal [sic] by gun [and] Homicidal ideation toward wife." In the Pauline Faulk Centre's discharge summary of July 6, 1995, Dr. Camren Adley noted that Chambers "presented with significant risks of immediate harm to self[,]" "continues to report suicidal ideations" and "continues to show homicidal ideations."
Also admitted into evidence were sworn affidavits by the Crowley Police Department attesting to Chambers' violation of La.R.S. 14:404, self-mutilation by a prisoner, on December 26, 1986 and May 18, 1995. The first instance was for an attempted hanging and the second incident was for the razor blade ingestion.
As the court in Lubom v. L.J. Earnest, Inc., 579 So.2d 1174 (La.App. 2 Cir.1991) gave little credibility to a workers' compensation claimant's uncorroborated account that his subsequent back injuries were caused by falls when his knee gave out, we, too, hold that in this instance, Chambers failed to prove work-related causation. Therefore, Chambers is not entitled to benefits of any kind as a result of injuries sustained in the June 1995 wrist incident.

REMAINING ISSUES
Since the workers' compensation judge's findings as to causation and disability are correct, Chambers is not entitled to any additional benefits. Accordingly, this holding pretermits our review of whether those benefits were forfeited pursuant to La.R.S. 23:1208, whether Chambers had any dependants within the definition set forth in La. R.S. 23:1201.4 or whether his benefits were arbitrarily and capriciously terminated.
Based on a totality of the evidence before us, we find no error in the decision of the workers' compensation judge.

CONCLUSION
For the foregoing reasons, the judgment of the workers' compensation judge is affirmed. Costs of this appeal are cast to Chambers.
AFFIRMED.